# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 16, 2013

## RICKY DALE NETHERTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Macon County**
**No. 07202    David E. Durham, Judge**

---

**No. M2012-00854-CCA-R3-PC - Filed November 14, 2013**

---

The Petitioner, Ricky D. Netherton, appeals the Macon County Criminal Court's denial of post-conviction relief from his convictions for first-degree and second-degree murder. On appeal, the Petitioner argues that he received ineffective assistance of counsel and that his guilty pleas were not knowing, voluntary, and intelligent. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

Jaimee H. Underwood, for the Petitioner-Appellant, Ricky D. Netherton.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Tom H. Swink, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On February 4, 2008, the Macon County Grand Jury indicted the Petitioner for two counts of premeditated first degree murder in violation of Tennessee Code Annotated section 39-13-202, for the deaths of Karen Schmidt and Matthew Schmidt. On March 5, 2009, the Petitioner entered a guilty plea to one count of first-degree murder and one count of second-degree murder, for which he received consecutive sentences of life imprisonment and twenty-five years, respectively.

At the March 5, 2009 guilty plea hearing, the State summarized the underlying facts as follows:

On [October 15, 2007], [the Petitioner], shot and killed Karen Schmidt, [the Petitioner]'s long time girlfriend, in her home in Hillsdale Estates in Macon County, with a twenty two caliber rifle.

After shooting Karen Schmidt, [the Petitioner] reloaded the gun and then shot Matthew Schmidt, Karen's fifteen year old son who was also in the home and on the telephone with Macon Sheriff's Deputy Dispatcher Ramona Hart.

Matthew Schmidt had called the Sheriff's Department because the [Petitioner] was arguing with Matthew's mother, and both Matthew and mother, Karen, wanted the [Petitioner] to leave.

. . .

As Ms. Hart dispatched deputies to the scene, Matthew gave a detailed account to Ms. Hart of what was happening. Matthew told Ms. Hart that [the Petitioner] went out to his truck and then came back inside the residence and resumed the argument.

[The Petitioner] then went back out to his truck, brought back in to the residence a long gun. Ms. Hart heard over the telephone line what she described as a noise that sounded like a firecracker. Matthew then told Ms. Hart that [the Petitioner] had shot his mother.

Matthew then told Ms. Hart that [the Petitioner] was reloading his gun. At that time, deputies advised Ms. Hart that they were thirty seconds from arriving at the scene. Ms. Hart then heard Matthew say, "oh, God, oh, God," then Ms. Hart heard moaning and lost contact with Matthew.

At that time, Sheriff's deputies arrived on the scene. Before they made entry they observed [the Petitioner] inside the residence holding a rifle. Deputies made entry. Sergeant Darryl Taylor disarmed [the Petitioner] and deputies took [the Petitioner] into custody.

TBI agents, Jason Locke, Colleen McEwen and Macon County Sheriff's Department, Detective Bill Cothran, [read the Petitioner his Miranda rights] and then interviewed [the Petitioner]. [The Petitioner] admitted to them that he shot both victims, both Karen and Matthew Schmidt on October 15, 2007. Autopsies performed by the state medical examiner's office confirmed that both died as a result of gun shot[] wounds to the chest.

The court then engaged in a dialogue with the Petitioner regarding his desire to plead guilty. The court explained the plea agreement to the Petitioner, including the sentences that would be imposed. The Petitioner agreed that the facts as summarized by the State were "substantially correct" and indicated that he understood what rights he would be giving up by pleading guilty. The Petitioner also agreed that he had fully and completely discussed the plea agreement with his attorney and was satisfied with his attorney's services. When asked whether there was anything his attorney could have done that he had not done, the Petitioner responded, "No, he's done everything." The court asked the Petitioner if he was on medication, and the Petitioner said "Yeah, some" and told the court he was taking it according to the prescribed dosage. The following colloquy then took place:

> COURT: Do you understand what you're doing here this morning?
>
> PETITIONER: Yes, ma'am.
>
> COURT: Are you in fact guilty of second degree murder on Count 1, and first degree murder on Count 2?
>
> PETITIONER: Yes, ma'am.
>
> COURT: Tell me what you did?
>
> PETITIONER: We was into it and I shot her then shot Matthew.
>
> COURT: You shot both of these people?
>
> PETITIONER: Yes, ma'am.
>
> COURT: Do you still wish to enter this plea?
>
> PETITIONER: Yes, ma'am.

The Petitioner's trial counsel also questioned the Petitioner about his desire to plead guilty, during which the Petitioner agreed that he had met with Counsel on multiple occasions and that Counsel had reviewed the entire plea agreement with the Petitioner prior to the hearing. The Petitioner also agreed that he and Counsel had discussed Counsel's preparation for the case and that he had met with their hired expert, Dr. Pamela Auble. The Petitioner further agreed that Counsel had told him that the court approved funds for a mitigation expert and an addictions specialist and that he would likely hire an expert in psychiatry as well. Counsel asked the Petitioner whether he had explained the Petitioner's

sentences to him and whether he understood the meaning of consecutive terms, reminding him that "you add them together. . . . It's life plus twenty-five years." The Petitioner agreed that Counsel had explained the sentences and that he understood the effect of a consecutive sentence. Counsel then asked, "Is there anything that you feel you don't understand?" and the Petitioner responded, "No. I understand it." Finally, Counsel asked, "And this is what you want to do with your case?" and the Petitioner answered, "Yes, sir." The Petitioner also affirmed that no one had threatened him to enter the guilty plea.

Following the hearing and upon finding that the Petitioner's guilty pleas were knowing and voluntary, the trial court accepted the guilty pleas. On January 22, 2010, the Petitioner filed a timely petition for post-conviction relief, alleging that he received ineffective assistance of counsel and that his guilty pleas were involuntarily and unknowingly entered.

At the June 6, 2011 post-conviction hearing, Counsel testified that he was appointed to represent the Petitioner on October 24, 2007. Counsel stated that at that time, he was under the impression that the State was considering the death penalty because "a fifteen year old boy was killed." Counsel assembled a defense team and met with the Petitioner to explore the possibility of any "mental issues" for their defense theory. They conducted research by interviewing the Petitioner's family members and coworkers. Larry Turnbow, one of the investigators, met with a family nurse practitioner who had seen the Petitioner on the day of the offense. The nurse practitioner confirmed that she had prescribed the Petitioner Paxil but denied giving the Petitioner any samples that day. Counsel conceded that they did not investigate the issue further but explained that "had this went on and he had not pled, you know, it could have resurfaced. We could have looked at it a little closer, maybe might have found something new that we didn't know."

Counsel testified that he decided to hire a psychologist to evaluate the Petitioner after speaking with family members and coworkers because he became concerned that the Petitioner may have been suffering from a "mental condition." He hired Dr. Auble to "get the ball rolling" and stated that the next step would have been to hire a psychiatrist. Counsel stated that he did not hire a psychiatrist at that point, however, because Dr. Auble opined that the Petitioner was competent to enter a guilty plea. He further explained that "since [the Petitioner] wanted to plead guilty, I had these other experts sort of on hold to see if he did plead guilty in fact. Had he not, then they would have [gone] to work on his case."

Counsel was asked about the Petitioner's first attempt to plead guilty, which occurred in October 2008. Counsel recalled that he reviewed the plea agreement in detail with the Petitioner, "read it word for word to him, then [] asked him at the end, you know, tell me what you're agreeing to, and he did." Counsel stated that he thought the Petitioner was

happy with the plea and "everything was fine." At the hearing, however, the Petitioner handed a piece of paper to Counsel, which indicated that the Petitioner had changed his mind. The letter stated:

> I, Ricky Netherton, have decided not to plead guilty to anything. I don't feel I have been represented very well in this case. I have been pressured to take a plea bargain in which I am not even sure I committed these crimes. So instead of sending myself to prison for the rest of my life, I at least want the benefit of the jury trial I am entitled to under the Constitution of the U.S.A. At this time, I can't see anything positive my attorney has done in my case. I have potential witnesses, medical records, and doctors statements that have all been ignored by my attorney. So at this time, I would like to dismiss my attorney . . . and ask the Court to appoint me counsel that will actually investigate my case.[1]

Counsel stated that he was "very shocked" by the letter and recalled that the Petitioner appeared in court a few days later and told the court that Counsel had not pressured him to take the deal. Counsel "continued to work on [the Petitioner]'s case" and received approval from the court for a mitigation expert and an addiction specialist. The defense team reviewed discovery with the Petitioner "many times" but did not provide the Petitioner with a copy of the discovery because the Petitioner was illiterate. Counsel stated he was certain he reviewed Dr. Auble's report with the Petitioner although he could not "recall the specifics." Counsel also stated that he had informed the Petitioner that he received funding for additional experts and recalled that he even asked the Petitioner about the experts during the March 5, 2009 guilty plea hearing.

Counsel acknowledged that Dr. Auble's report concluded that the Petitioner is "mildly mentally retarded" but reiterated that she also opined that the Petitioner was competent to enter a guilty plea. Other than "mental issues," Counsel did not recall any other defense theories. He stated that Dr. Auble's report helped provide "some mitigation" but opined that "this was just a very bad case in light of a fifteen year old was killed." Counsel stated that he told the Petitioner that this was a "very difficult case. . . . He was looking at probably spending the rest of his life in prison."

Counsel was asked about his understanding of the death penalty and its limitations with regard to mentally incompetent individuals. Counsel responded, "I'm thinking it's somewhere around 65 [I.Q.], about where [the Petitioner] is, is too mentally retarded to give

---

[1] The Petitioner informed the court that his cell mate wrote the letter at his request because the Petitioner cannot read or write.

the death penalty to" but stated that he "personally did not think the State was going to ask for the death penalty in this case." Counsel recalled that the State filed a notice of intent to seek life without parole prior to the Petitioner's first plea attempt,[2] which he reviewed with the Petitioner. When asked whether he thought the Petitioner understood that he was not going to get the death penalty based on that notice, Counsel responded, "What he understood, I have no way of knowing, but he fully had been advised that the State had filed a notice seeking life without parole . . . and I told him that I didn't think the State would seek the death penalty." When asked whether he thought the Petitioner's plea was a good idea, Counsel stated:

> [I]t was [the Petitioner]'s case and that's what he communicated to me that he wanted to do with his case. . . . [F]rom the very beginning he didn't want a trial. He never indicated to us really that he wanted a trial. That letter . . . is about the first I had heard of him wanting a trial because he wanted right the opposite. He didn't want to put the families through it . . . [W]hether I thought it was a good idea or not is not relevant. I was trying to represent him and do what he wanted to be done as best I could, and that's what he communicated to us . . . that he wanted to do with his case, and that's what we did.

On cross-examination, Counsel stated that he never had any problems communicating with the Petitioner and that the Petitioner made the decision to accept the State's guilty plea offer.

The Petitioner testified that he met with Counsel and his defense team approximately ten to fifteen times before pleading guilty. He testified that he requested his discovery from Counsel prior to his plea but never received anything until after he entered his plea. He stated that he first saw Dr. Auble's report when he went through his discovery at that time. The Petitioner testified about his "mental issues," explaining that he suffers from "illusions and depression and stuff like that." He later clarified that by illusions, he meant hallucinations.

The Petitioner explained that he started drinking heavily after his brother died and that on the day of the offense he was "drinking and eating pills left and right." He recalled that on the day of the offense he went to the doctor because he was "having attacks and depression and all that," and the nurse practitioner gave him "Paxils and samples of inhalers and prescriptions and stuff." He stated that he has a prescription for Paxil and dropped it off that day after going to the doctor but never picked it up. Later in the day, the Petitioner

---

[2] The State filed a notice to seek life without the possibility of parole on June 5, 2008. The Petitioner's first guilty plea hearing, during which the Petitioner did not plead guilty, was held on October 5, 2008. The Petitioner's final guilty pleas were entered on March 5, 2009.

picked up beer and went fishing with the two victims and his son, Josh Netherton. He estimated that he consumed three to four six-packs of beer and was "eating handfuls of Xanax" although he acknowledged that he did not have a prescription for this medication.

The Petitioner recalled meeting with Dr. Auble during which she conducted numerous tests for the Petitioner's mental evaluation. He stated that he did not receive her report until after he had entered his guilty pleas and did not recall anyone discussing her report with him. He further stated that no one discussed his I.Q. with him prior to his guilty pleas nor told him that it could affect the State's ability to seek the death penalty. He insisted that had he known about his I.Q. and Dr. Auble's report prior to his guilty plea, he would not have pled guilty. He stated that Counsel told him "all the time" that he would get the death penalty if his case went to trial, which pressured him into pleading guilty, and that he learned that the State did not plan to seek the death penalty only after entering his guilty pleas.

On cross-examination, the Petitioner acknowledged that he had filed a motion to withdraw his guilty plea several months after entering it. He later wrote his attorney[3] a letter stating, "I, Ricky Netherton, want to stay with my plea which I have already signed. I do not want to put my family through it." His attorney filed a motion to strike his motion to withdraw his guilty plea, attaching the Petitioner's letter in support. When questioned about his desire to strike his withdrawal motion, the Petitioner explained that he had not been through all of his discovery at that point and was "just all confused."

Larry Turnbow, one of the defense investigators on the case, testified that he was assigned to the Petitioner's case the day that Counsel was appointed and immediately began investigating. He met with the Petitioner, his family, and his coworkers to gather information. He also interviewed the nurse practitioner that treated the Petitioner on the day of the offense. She told Mr. Turnbow that she had not given the Petitioner any sample medication that day but confirmed that she had written him a prescription. He learned through interviews with family members that the Petitioner "drank a lot and had hallucinations and mental problems." He explained that "usually we're told by the lawyers who to go see, what to do, and that's what we do . . . we don't do something without a lawyer's approval." He further testified that he made reports based on his investigations and turned them over to the lawyers, and "if there was anything further they wanted me to do, they'd tell me and I'd do it."

On cross-examination, Mr. Turnbow testified that he reviewed all of the discovery with the Petitioner at the jail "more than three times." On redirect, Mr. Turnbow testified

---

[3] Counsel was relieved as the Petitioner's attorney on July 23, 2009, and new counsel was appointed.

that he did not recall talking to any of the Petitioner's family members at the Petitioner's first plea hearing in October 2008.

Joshua Netherton, the Petitioner's son, testified that the Petitioner was drinking "a lot" on the day of the offense, but he did not remember whether he saw the Petitioner take any medication. Mr. Netherton stated that the Petitioner's mental state "kind of started to slack off" in the months leading up to the offense and that he tried to convince the Petitioner to go see a doctor. He further explained that the Petitioner's family became concerned about the Petitioner's mental state when he told them "that he thought that my sister had hit the lottery, the FBI had us drugged, you know, it was a bunch of stuff that I can't remember now because there was so much of it, so we knew something was wrong." He testified that after the Petitioner decided not to plead guilty in October 2008, Counsel and Mr. Turnbow "wanted to set us up an interview with [the Petitioner] back in the visitation room to try to get him to plead guilty." He stated that he convinced the Petitioner to plead guilty because he was told by Counsel that "if he pled not guilty they would seek the death penalty."

Amanda Meador, the Petitioner's daughter, also testified about the Petitioner's mental condition. She testified that the Petitioner called her every day "thinking that the FBI was after us and gave us – gave the whole family pills to make us forget stuff that had happened that only he could remember . . . [and] I won the lottery and I didn't remember it." On the day of the offense, the Petitioner appeared intoxicated but she did not witness him taking any medication. She stated that after the Petitioner decided not to plead guilty in October 2008, she tried to convince him to plead guilty to avoid the death penalty because Mr. Turnbow told her "it would probably turn out that way if he didn't take the plea bargain."

Kathy Russell, the Petitioner's sister, testified that on the day of the offense she witnessed the Petitioner take a "white pill" while at her house after he returned from fishing, but she did not see him drink any alcohol. She stated that he was acting "real nervous and depressed, like there was something wrong. . . . He just wasn't acting right. He hadn't been for the last three months." She stated that she tried to call Counsel's office several times but never received a return call. She also stated that no one ever discussed the Petitioner's plea agreement with her.

Following the hearing, the post-conviction court took the matter under consideration and entered an order on June 14, 2011 denying the Petitioner relief. The order states, in relevant part, the following:

> The Petitioner's first ground alleged was that trial counsel was ineffective for failing to properly investigate the case, particularly as regards to the Petitioner's ability to form the proper mens rea due to his low I.Q. and

his drug and alcohol use at the time the murders were committed. From the evidence presented at the hearing, including the testimony of [Counsel], Petitioner's experienced counsel at plea, and Mr. Larry Turnbow, the experienced and well-qualified investigator for [Counsel], and Exhibits . . . the Court finds that [the] Petitioner's counsel investigated all possible mental defenses whether pertaining to low functioning I.Q., or ingestion of alcohol or controlled substances, that [C]ounsel not only had [the] Petitioner evaluated prior to the plea for mental competence, but also had two other expert witnesses prepared to evaluate the Petitioner and his case if necessary. The Court further finds from the testimony and Exhibits that the preceding was thoroughly explained to the Petitioner, and that the Petitioner understood all the steps which had been taken, and which [C]ounsel prepared to take in preparation for trial, if necessary.

Petitioner's second ground alleges that his pleas . . . were not knowing and voluntary, and that he only pled guilty because [Counsel] and [Mr. Turnbow] convinced him and his family that pleading guilty was the only way he could avoid the death penalty. [The] Petitioner now feels he was never "death qualified."

As stated, [the] Petitioner pled guilty on March 5, 2009. The State's notice to seek life without parole was filed on June 5, 2008, nine (9) months before the plea. [The] Petitioner's Request for Acceptance of Plea of Guilty, Petitioner to Waive Trial by Jury and to Waive an Appeal clearly sets forth the maximum punishment [the] Petitioner was facing was life without parole. No death notice was ever filed by the State. At his plea, [the] Petitioner states on the record that he understood what he was doing . . . [and] [Counsel] testified at the hearing that the penalties were fully discussed with the Petitioner and that he understood them. [Counsel] further testified that it was [the] Petitioner's desire from the very beginning of his representation that he plead guilty to avoid putting his (Petitioner's) family and the victim's [sic] family through the trauma of a trial when Petitioner knew the evidence against him was overwhelming.

Based on these factual findings, the court concluded that the Petitioner had failed to prove his allegations by clear and convincing evidence, and therefore, was not entitled to post-conviction relief. It is from this order that the Petitioner now appeals.

## ANALYSIS

On appeal, the Petitioner asserts that Counsel provided ineffective assistance of counsel by failing to properly investigate the Petitioner's case and by erroneously advising the Petitioner that if he went to trial, he would be exposed to the death penalty. Consequently, the Petitioner asserts that he entered unknowing and involuntary guilty pleas. The State responds that the post-conviction court properly denied relief because the Petitioner failed to prove that Counsel's performance was constitutionally ineffective or that the Petitioner's pleas were involuntary. Upon review, we agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In Vaughn, the Tennessee Supreme Court repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

-10-

<u>Vaughn</u>, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. <u>Id.</u> (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." <u>Id.</u> at 369 (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter</u>, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Id.</u> at 370 (quoting <u>Strickland</u>, 466 U.S. at 694). Within the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985); <u>see also</u>, <u>Serrano v. State</u>, 133 S.W.3d 599, 605 (Tenn. 2004).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>State v. Burns</u>, 6 S.W.3d 453, 462 (Tenn. 1999) (citing <u>Strickland</u>, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." <u>Strickland</u>, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" <u>House v. State</u>, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting <u>Goad</u>, 938 S.W.2d at 369).

**I. Ineffective Assistance of Counsel.** In alleging that Counsel provided ineffective assistance of counsel, the Petitioner specifically argues that Counsel unreasonably halted investigations into possible defenses and rendered deficient advice because he was ignorant of pertinent law and its effect on the Petitioner's case. The Petitioner maintains that but for

counsel's deficiencies, he would not have pleaded guilty and would have proceeded to trial.

The Tennessee Supreme Court has held that "[f]ailure to conduct a reasonable investigation constitutes deficient performance." Burns, at 6 S.W.3d at 462.

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. . . . And, of course, the duty to investigate also requires adequate legal research.

Baxter, 523 S.W.2d at 932-33 (quoting United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)). In any ineffective assistance of counsel case, however, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Burns, 6 S.W.3d at 462 (quoting Strickland, 466 U.S. at 691).

Turning to the Petitioner's first claim, that Counsel failed to investigate his case and possible defenses, the post-conviction court found that Counsel adequately investigated all possible mental defenses, including those related to the Petitioner's I.Q. and those related to his drug and alcohol use on the day of the offense. The court further found that Counsel had the Petitioner evaluated prior to entering his pleas and had other experts available to work on the case if the Petitioner decided not to plead guilty. The court credited Counsel's testimony that he fully informed the Petitioner of the steps he had taken to prepare for trial and reviewed the sentences the Petitioner was facing under the plea agreement. Based on the record and testimony presented, the court concluded that the Petitioner failed to prove by clear and convincing evidence that Counsel provided ineffective assistance of counsel.

The record does not preponderate against the findings of the post-conviction court. As an initial matter, in Dr. Auble's April 25, 2008 preliminary report, she diagnosed the Petitioner with "mild mental retardation with an IQ of 66." She further opined as follows:

> [The Petitioner] was suffering from the mental diseases and defects of major depressive disorder with psychotic features, generalized anxiety disorder, dementia, and mental retardation at the time of the offense. . . . [The Petitioner] lacked the capacity to premeditate at the time of the offense due to his mental diseases and defects, and therefore lacked the capacity to form the requisite mental state to be guilty of premeditated murder.

-12-

Given these findings, the Petitioner claims that Counsel's investigative efforts were unreasonably cut short. He insists that Counsel should have investigated further into diminished capacity and intoxication defenses. However, Counsel conceded that he believed the Petitioner "may have been having some mental condition" on the day of the offense. He did not seek a supplemental psychiatric report because, on October 3, 2008, he received letter from Dr. Auble in which she opined that the Petitioner was competent to enter a guilty plea.[4]

Additionally, Counsel explained the ramifications of Dr. Auble's report to the Petitioner and continued to investigate both the Petitioner's mental problems and his drug and alcohol use. Counsel or defense investigators interviewed the Petitioner's family members and met with the family nurse practitioner that saw the Petitioner on the day of the offense. Counsel's team also investigated the Petitioner's prescription history and possible adverse affects of the Petitioner's medication. After the Petitioner's first attempt to plead guilty, Counsel continued to work on the Petitioner's case and obtained court approval to utilize two additional mental health experts.

Based on the above proof, we cannot conclude that Counsel was deficient in investigating the Petitioner's case. We also note that the Petitioner put forth no evidence to support his claims or prove that such investigations would have benefitted the Petitioner's defense. In an ineffectiveness case alleging deficient investigation, the Petitioner must present evidence to prove what further investigations would have revealed. Black v. State, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990). Neither the post-conviction court nor this Court "can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." Id. Thus, the Petitioner has failed to carry his burden and is not entitled to relief.

Next, the Petitioner claims that Counsel was ineffective because he was ignorant of the applicable law and advised the Petitioner to accept the State's plea offer based upon his misunderstanding of the Petitioner's exposure to the death penalty. The Tennessee Supreme Court recently addressed ineffective assistance of counsel within the context of advising a defendant about a guilty plea in Grindstaff v. State, 297 S.W.3d 802 (Tenn. 2009). There, the court held that counsel's performance constituted ineffective assistance of counsel where he advised the petitioner, who was ineligible for alternative sentencing under the law, that

_____

[4] This letter was not included in the record on appeal. Additionally, the Petitioner does not contend, nor do we address, whether he was mentally incompetent to enter a guilty plea. See, e.g. Godinez v. Moran, 113 S.Ct. 2680 (1993) and Drope v. Missouri, 420 U.S. 162 (1975) (holding that a mentally insane or incompetent defendant cannot be required to plead to an offense, be tried, convicted or sentenced).

he may receive an alternative sentence if he pleaded guilty. Id. at 222. In reaching its holding, the court turned to the American Bar Association Standards for Criminal Justice for guidance:

> Defense counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused decision as to his or her plea.

> Defense counsel may engage in plea discussions with the prosecutor. *Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial.*

> *Defense counsel should, at the earliest possible time, be or become familiar with all of the sentencing alternatives available to the court. . . .* Defense counsel's preparation should also include familiarization with the court's practices in exercising sentencing discretion, the practical consequences of different sentences, and the normal pattern of sentences for the offense involved. . . . The consequences of the various dispositions available should be explained fully by defense counsel to the accused.

Id. at 220 (quoting ABA Standards for Criminal Justice, Defense Function Standard (3d ed. 1993)), available at http://www.americanbar.org/publications/criminal–justice–section–archive/crimjust–standards–dfunc–blk.html). The Grindstaff court concluded that "[b]ecause trial counsel failed to ascertain the status of the law and failed to inform the Petitioner that he was not eligible for an alternative sentence, his performance was deficient." Grindstaff, 297 S.W.3d at 221; see also, Moss v. United States, 323 F.3d 445, 474 (6th Cir. 2003) (stating that counsel's failure to "provide professional guidance . . . regarding . . . sentence exposure prior to a plea may constitute deficient assistance.").

Of course, within the context of an ineffective assistance of counsel claim, the Petitioner must also demonstrate prejudice resulting from counsel's deficient performance; that is, a reasonable probability that "but for trial counsel's deficient performance, 'he would not have pled guilty and would have insisted on going to trial.'" Id. (quoting Hill, 474 U.S. at 59). In Grindstaff, the court concluded that "the record demonstrates a reasonable probability that if trial counsel had adequately researched the applicable law and informed the Petitioner that alternative sentencing was not available, he would not have entered an open plea of guilt," and thus, concluded that the Petitioner was denied effective assistance of counsel.

Turning to the case at hand, our review of the record does not lead to the same conclusion. In Grindstaff, the petitioner put forth clear evidence both that counsel incorrectly advised him as to his eligibility for alternative sentencing and that he would not have entered the guilty plea had he been properly informed of the law. In contrast, the Petitioner in the present case has failed to prove that Counsel incorrectly advised him as to his exposure to the death penalty or that he based his decision to enter a guilty plea upon Counsel's faulty advice. Thus, unlike in Grindstaff, we conclude that the Petitioner has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel.

Rather than revealing that the Petitioner was ill-informed, the record supports the post-conviction court's findings that Counsel correctly explained to the Petitioner the potential penalties he was facing and the terms of the plea agreement. Counsel testified that he initially thought the State may seek the death penalty due to the fact that a fifteen year old child was murdered; however, after the State filed its notice of intent to seek life without parole, Counsel stated that he "did not think the State was going to ask for the death penalty" and that he advised the Petitioner accordingly.[5] At the guilty plea hearing, the court and Counsel both engaged in a thorough discussion with the Petitioner about his desire to plead guilty and his understanding of his plea agreement. The Petitioner testified that he had fully reviewed the plea agreement with Counsel, understood the terms and punishment he was facing, and was not coerced or threatened into entering a guilty plea. The post-conviction court accredited this testimony despite the Petitioner's contradictory testimony at the post-conviction hearing, and the record does not preponderate against these findings.

Moreover, even if we were to conclude that Counsel incorrectly advised the Petitioner about the death penalty, rendering his performance deficient, the Petitioner has failed to prove that he was prejudiced by such advice. In order to prevail on his ineffectiveness claim, the Petitioner must prove that but for Counsel's actions, there is a reasonable probability that he would not have entered a guilty plea and would have insisted on going to trial. Although the Petitioner testified that had he known about Dr. Auble's report and the law surrounding the limitations on State's ability to seek the death penalty, he would not have entered his

---

[5] A defendant with an "intellectual disability" as defined by statute at the time of committing first degree murder is ineligible to be sentenced to death. T.C.A. § 39-13-203(b). The existence of an intellectual disability is a factual determination made by the court based upon the preponderance of the evidence, with the burden of production and persuasion explicitly placed on the defendant. See section 39-13-203(c). As correctly noted by the State in their brief, the State could have filed a notice of intent to seek the death penalty and would have had the opportunity to rebut Dr. Auble's findings with its own proof. Thus, the Petitioner was not completely insulated from capital punishment as the Petitioner seems to suggest in his brief. Therefore, Counsel's initial determination that the Petitioner was at risk for the death penalty, albeit a low risk, was not an incorrect assessment of the law.

guilty pleas, the record does not support this assertion. Counsel testified that the Petitioner informed him early on that he did not wish to proceed to trial because he did not want to "put the families through it." This testimony was supported by the very words of the Petitioner in his letter expressing his desire to strike his motion to withdraw his guilty pleas wherein he states, "I do not want to put my family through [a trial]." Thus, based on the evidence presented, we cannot conclude that the Petitioner entered his guilty pleas to avoid the death penalty. The Petitioner has failed to prove his claims by clear and convincing evidence and is not entitled to relief.

**II. Guilty Plea.** The Petitioner next asserts that his guilty pleas were involuntary and unknowing, maintaining that they were based upon a misunderstanding of his exposure to the death penalty. He contends that Counsel coerced him into entering his guilty pleas by continually telling him and his family members that he would likely face the death penalty if the case went to trial, which convinced the Petitioner that a death penalty sentence would be certain if he did not accept the guilty plea offers.

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligently made. Id. These factors include the following:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him;

the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In denying relief on this issue, the post-conviction court emphasized that the State filed an intent to seek life without parole notice nine months before the Petitioner entered his guilty pleas and never filed a death notice, and concluded that the Petitioner was fully advised of the terms of his plea agreement and the applicable punishment. The court credited the Petitioner's testimony at the guilty plea hearing, during which he affirmed that he had reviewed the plea agreement with his attorney, understood its terms, and was voluntarily entering his guilty pleas without any coercion. The court also credited Counsel's testimony that the Petitioner desired to plead guilty to avoid putting his family and the victims' family through a trial. Thus, the court determined that the Petitioner had failed to prove by clear and convincing evidence that his guilty pleas were involuntary and unknowing.

Our review of the record supports the post-conviction court's findings. Although the Petitioner testified that he learned that the State did not plan to seek the death penalty only after he pled guilty, the record indicates otherwise. Like the post-conviction court, we emphasize that the State's notice of intent to seek life without parole was filed four months before the Petitioner's first guilty plea attempt and nine months before his final guilty pleas were entered. Counsel testified that he informed the Petitioner about the State's notice and told the Petitioner he did not think the State would seek the death penalty. During the guilty plea hearing, the Petitioner affirmed that he had reviewed the plea agreement with Counsel and understood the proceedings. Despite his testimony at the post-conviction hearing, nothing in the record suggests that the Petitioner was coerced into pleading guilty to avoid the death penalty. Rather, the record supports the post-conviction court's conclusion that the Petitioner chose to accept the guilty plea to avoid putting his family and the victims' family through a trial. Therefore, we conclude that the Petitioner has failed to establish that his guilty pleas were unknowing and involuntary, and he is not entitled to relief.

## CONCLUSION

Based on the above authority and analysis, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-17-